We'll hear argument this morning in Case 20-1034, Golan v. Saada. Ms. King? Mr. Chief Justice, and may it please the Court. The Hague Convention provides that a court is not bound to return a child once the grave risk exception is met. The District Court here, after finding grave risk to this child, was operating under an incorrect rule of law. That is, the Second Circuit's requirement that courts must examine the full range of potential mutilative measures and return the child if at all possible. That requirement should be overturned for four reasons. It's not found in the text of the Convention or its implementing legislation. It runs counter to the Convention's purposes and framework, which emphasize expeditious proceedings, the safety of the child, and not getting entangled in custody matters. It's contrary to the long-standing views of the State Department, and no other signatory nation has adopted that interpretation of this treaty. If this Court agrees with us, what remains is how best to resolve this case. In our view, a reversal is warranted. It was three years ago today that the District Court made its grave risk finding. Safe and swift resolution then would have allowed the child to remain in the U.S. in the interim, while the custody proceedings deal with the complex family issues in this case, including the implications of Mr. Sada's sustained and horrific abuse. But the District Court was forced by the Second Circuit to take a lengthy detour, which entangled itself in custody matters, forced the parties to obtain an Italian court order without investigating the effectiveness of that order. That process and the results are inconsistent with the Convention. At once, far too long, far too entangled, and at the same time, not robust and not protective enough. The child here is almost six years old. He has spent the vast majority of his life in legal limbo. Reversal provides the safe and swift closure he deserves. I welcome the Court's questions. Your position is that the District Court should not have been required to consider ameliorative efforts, right? That's correct, Your Honor. But would it be necessarily an abuse of discretion if he chose to do so? It depends on the manner in which that consideration might take place. Our position is that the discretion to consider ameliorative measures is provided by the Convention, but is also limited by the Convention. So if consideration of ameliorative measures takes too long or entangles the Court in custody matters or is somehow inconsistent with the Convention on other grounds, that would be an abuse of discretion. Okay, but if it was something pretty cut-and-dried and very simple, I mean, the grave risk is that his house is next to a nuclear waste dump, and he says, well, I'm moving in two weeks, here's the agreement, that is an ameliorative condition that the judge can take into account. Well, it depends on the stage of the case. At the grave risk determination phase, the judge can certainly take into account whatever evidence the parties submit to the Court. After determining that a grave risk exists and you move to a remedy stage and consider ameliorative measures, in the case where the grave risk is straightforward and simple, easy to identify and easy to resolve, then certainly it makes sense that the Court does have discretion to consider the easy solutions and to consider return subject to those solutions.  The way you just framed the inquiry, Ms. King, is like, well, first we decide whether there's a grave risk and then we see whether there's anything that we can do about it. But is that necessarily the right way to frame the issue? I mean, how do you decide, really, whether there's a grave risk without thinking about ameliorative measures at that stage? I mean, is this really a two-step inquiry, or should we think about ameliorative measures in order to determine whether there's a grave risk? Well, Justice Kagan, I acknowledge that there is some overlap in the inquiry here because both address risk. But the grave risk analysis is separate from an ameliorative measures analysis because the grave risk analysis, which is provided for by the Convention itself, is simply identifying whether or not the circumstances that exist now to which the child would be returned present a grave risk of exposure to psychological or physical harm. Once that is determined, then the district court should have the discretion to decide whether or not it is possible to consider, or even preferable to consider, ameliorative measures to then address the risk. If you combine the two, you run the risk of making this trial extremely lengthy and wading into issues that a Hague expedited proceeding should not be wading into. So it should be kept as two separate inquiries. Just very briefly, it seems to me that if you separate the two inquiries, that's what's going to lengthen the process. If you say the grave risk here is that he's going to live next to a nuclear waste dump and somebody says, I'm leaving, well, that's fine. But if you have to go through an entirely separate analysis and say, don't tell me whether there's ameliorative measures or not, don't tell me if you're going to move or not because that comes later, that seems to be something that's going to delay it. Well, if there's no grave risk at all, then you wouldn't even reach that second stage in the vast majority of cases. The parties are not going to be able to satisfy the very high evidentiary burden that ICARA places on parties to satisfy the grave risk exception. It has to prove by clear and convincing evidence. So there's no need to even get into this hypothetical world of what ameliorative measures are necessary. I mean, I acknowledge that there may be some cases where it's so obvious and so discreet and simple that the court may, in the course of having the trial, think about ameliorative measures. And certainly the parties can always propose measures and make evidentiary submissions. But I don't think as a matter of principle and process it makes sense to combine the two because that would entangle the court in a very lengthy process in every case, which is exactly what we don't want. This is a problem that I had, exactly what's been articulated. And then I began to think, and tell me if I'm right because I am a lay person here. You are the expert. The ameliorative measures wasn't the right words. What happened was better words were undertakings. The father who was in the foreign country was a risk to the child either because he beat up the wife or maybe he attacked the child. And then the judge would say here, well, give us a promise. It may be backed up by some money or a bond or something. And then undertakings didn't seem the right word because undertakings could have included not just I promise but also because they get some kind of a foreign lawyer or judge to say he has to follow these undertakings and we'll watch it. So now it's undertakings plus. And then we get to a new word for it called ameliorative measures. If what I've said is correct, I understand the confusion. I don't know how to write it still because my first reaction when a lay person reads those words ameliorative measures they say, hey, if there are ameliorative measures, what's the risk? And if there's not, well, then there's a risk. So of course they're going to consider this when they consider whether there's a risk. Now, do you see how confused I am? Can you straighten me out in a minute or two? Certainly confusing in this space. But have I got it sort of right or not? Well, different courts use these words interchangeably which is really the problem. Are we talking basically about undertakings or undertakings plus? Undertakings are promises, I think, of the petitioner below himself. So he might make promises. Undertakings plus. He makes some promises and then we get to try to make them enforceable. Well, yeah, what the Second Circuit then required was trying to overlay on top of that some guarantee of performance and that's where we ended up on this path of trying to figure out something. Okay, so the answer is judge. You're the trial judge. You look in these things when you think they're useful and you don't when you think they're not. We certainly agree that the district court should have had discretion to look at things when it seems appropriate or perhaps even reject the entire concept because the very act of walking the path of considering hypothetical full range, full panoply of emulative measures is simply too boring. No, of course not, but of course it does make sense if they have an ongoing like the EU does it within the EU, you know, because they all know their courts in the other countries and they have family courts in other countries and the family courts in other countries. If they are going to deal with it, they can deal with it. Justice Breyer, I think that's exactly our point here. The United States is only a signatory and has only adopted the 1980 convention. The EU countries are part of Brussels 2A. Other countries have adopted the 1996 convention and the United States did not ratify that. So we are working only within the framework of the 1980 convention. I'm sorry. Counsel, I'd like to go back to the question the Chief started with. What's an abuse of discretion? Assume, as I do, that there are two goals to the convention. Not one. It's not just a speedy proceeding. It is an intent to return a child to its habitual residence. That's its number one priority. Its second priority is to protect the child if there's grave danger. But if the convention insisted that a child shouldn't be returned, it would have said don't return the child because it's a grave danger. But instead it gives the district court discretion. So to me that means that you have to keep the first goal in mind as well. You can't just eliminate it when you find grave danger. Do you agree with that? We certainly agree that the convention vests discretion. So let's stop with that question there. Maybe the Second Circuit went too far in saying the district court has to look at every possible ameliorative measure, even those not raised by the party. That seems contrary to the adversarial system. Generally we depend on judges to rely on what the parties present. We don't make the judge a litigant by looking for things. So assume we say, you know, that Second Circuit rule is too extreme. What if a district court judge said, you know something, yes there's an ameliorative measure like he can move away and we can wait two weeks and he would do it, but I really don't want to bother waiting those two weeks. I don't care whether it would fix the problem or not. You seem to be using the word discretion to say if the measures are proposed the judge never has to explain what they think or no matter what they think we have to uphold it. Or even any delay whatsoever is enough of a reason not to do it. That seems contrary to the concept that there should be a reason for what you do and that the reason should be based in the evidence and that you shouldn't just say I don't want to. You should give a reason. We certainly were not implying that it's unfettered discretion with no limitations and that you can not give a reason and reject submissions by the parties. I think in that circumstance it falls back to reasoned judgment as the judge treats any evidentiary submission by the parties below and there has to be reasoned consideration and some reasoning for the decision that follows. But I do want to clarify that the hierarchy you posed of prioritizing return of the child and only secondary consideration of the safety of the child I think is incorrect. The Convention has multiple goals and multiple purposes. Safety is, I think, the preeminent one. The interests of the children are cited as a paramount interest in the preamble to the Convention. Expeditious proceedings, which we all acknowledge is definitely a goal. And return of the child is a goal, but there are exceptions. And the very existence of the exception, the grave risk exception here, shows that that goal is not without limitations. It's not at all cost, as this Court has recognized before. And there are certain values and principles that are more important than prompt return. Thank you. I have sort of a threshold problem in understanding this statute and the way the parties and the Solicitor General have interpreted it. Article 13J says that a requested state is not bound to order the return of the child who would otherwise have to be returned if there is a grave risk, right? Correct. So are there circumstances in which you think a district court could order the return of a child who would be at grave risk? I think that would become an abuse of discretion unless there were some extraordinarily unusual circumstances. I mean, just to say it's an abuse of discretion doesn't really answer the question for me. Under what circumstances would it not be an abuse of discretion to do that? Under what circumstances would it be permissible for an individual district judge to say, it's been proven by clear convincing evidence that there would be a grave risk, nevertheless send the child back? If there were some balancing of grave risk and there was a demonstration that there's more grave risk in the present country versus the return country, I think it would be an extraordinary circumstance and our position would be it would be an abuse of discretion in the regulation. All right, well that sounds like basically a categorical rule, that you can't do it, which is not what Article 13J says. Given the different interests of the convention, which places the child's safety as the paramount interest, returning a child after finding that there's a clear and convincing evidence of grave risk is fundamentally antithetical to the convention and therefore an abuse of discretion. Okay, I think that's a strong argument. I think it would have to be based on something other than the convention itself. It would have to be based on the way the United States chooses to interpret the convention. That could be done by statute, but since statute doesn't address this, could it not be done by the courts in the case law interpreting it? Well, ICARA implements the treaty and adopts the provisions of the treaty and I think that includes putting safety of the child as the primary goal in interpreting the treaty and handling these hate cases. Well, do you see my problem? I'm stuck on the idea that every one of the district judges in the United States has the discretion to decide whether I'm going to return this child to the country of habitual residence, despite the fact that it's been shown that there would be a grave risk there. I definitely think that would be an abuse of discretion. So there have to be standards about when that would be done. I don't know when. When would that be appropriate? You don't think there are any. We don't think there are. Okay, so then it's pretty much a categorical rule and if it's going to be a categorical rule, then doesn't that lead you to something like what the Second Circuit has done? Maybe they've gone too far, but to develop standards that have to be met, such as providing ameliorative conditions in that country so that the child would not be at grave risk. Ultimately, we have competing goals in the operation of the convention and the Second Circuit in trying to satisfy this ameliorative measures exercise, which by the way is not in the convention or at ICARA. So this is already off on a tangent. But that process cannot apply for all cases because then you end up with a delay situation. You may not be able to satisfy it. Their standards might not be the right standards, but do you dispute the proposition that it's entirely appropriate for them or for us to develop standards? Or are we just supposed to say abuse of discretion, every district judge just does whatever the judge wants? It is entirely appropriate to develop standards that are consistent with the convention and that come from the convention's own requirements and limitations. Congress has also done that in ICARA by setting us higher evidentiary standards. And standards designed to make sure that the child is not sent back if there is a grave risk. If there's a grave risk, with or without, even with any ameliorative conditions that could be put in appropriately without unduly delaying the proceeding or getting into custody determinations in the country of habitual residence, then the child cannot be sent back. We certainly agree with the standard that prevents sending children back to situations where they are at grave risk of harm. Justice Breyer, anything further? Justice Gates? Justice Gorsuch? Can you just briefly summarize why you think a remand would be problematic as compared to a reversal? So this case has been progressing for three and a half years at this point. A remand would require more process because there needs to be a reevaluation of the current circumstances. A lot has happened in the last two years since the last return order. And that process alone, in the same way that we object to the second circuit mandatory rule in the first place, that process alone is damaging to the child and inconsistent with the convention. It's certainly a possible outcome here, a possible remedy, but we think on balance there is a safe and swift remedy available to this court and for this child, and it would serve the child's interest and be consistent with the convention to take that remedy now and end this rather than send it back for a third bite at the apple. Thank you. You're thinking, maybe I will ask a question. I think it might be a problem. Judges in different countries, there's a child in front of them. The child is facing harm if they send him away. And the judge is going to think, whatever he says, or she, hey, I've got this child here in my country and I know that child is safe and I'll be damned if I'm going to send him to some other place that I don't even know about. Okay? So there will be a tendency to keep the child here. And I think what the second circuit wants to say is remember the overall purpose of this treaty. It's trying to stop kidnappings. And remember that. And try and overcome your natural instinct. But pay attention to it. But, but, but. Okay. We of all the courts know least about it. Family courts know about it. We don't. You know about it. Federal courts don't. Okay. What words do you suggest that we write in this opinion? Which I think recognize the motivating problems. And would try to do what the second circuit is trying to do, but maybe overkill. But you're the expert. What words would you like, if we can, to deal with the problem I sketched? We would suggest that after a grave risk finding, courts have discretion to deny the petition for return or to grant it subject to amulet of measures. But consistent with the convention, any discretionary consideration of amulet of measures must be expeditious. It must not entangle the court in custody matters. And any measures imposed must be limited, enforceable, and effective at protecting the child. And just speaking to your point, Justice Breyer, of the court's instinct to want to protect the child, these are cases where the mother, in this case, has already demonstrated by a very high evidentiary threshold,  And in those types of cases, protecting the child is a worthwhile instinct, keeping in mind that the Hague process is an interim measure. It's a temporary resolution to keep the child, while the custody courts, the courts that have expertise and time to deal with these complicated, very difficult issues, they are the ones that can move forward. And the irony in this case is, because of this detour, this child has not had that type of custody hearing. And if this case had ended three years ago, we wouldn't be here today, and we think that the case should end today as well. Justice Barrett, anything further? I do. Am I correct that the vast majority of these grave risk cases are ones involving domestic abuse? They're certainly grave risk cases of all types. The majority of them these days is now involving domestic abuse. But only a very, very small percentage get to the level of proving grave risk by clearing convincing evidence. I'm referring to the number of cases that raise the grave risk defense. Right. It just seems to me that that's a much different case for ameliorative measures than, say, the nuclear plant next door that the chief posited at the outset. That would be a pretty straightforward move, and then there would be no more grave risk, whereas I think you get into the complexity of the financial support payments and the undertaking or restraining order, however it should be categorized, in these domestic abuse cases that pose maybe a unique circumstance. That's right, Justice Barrett. I think that the nature of the grave risk in a domestic violence case is extremely complicated, and it gets into mental health issues, psychological, very detailed family issues, and it would be very difficult to resolve that in an expedited proceeding, much less try to resolve that thinking about what it's like in a foreign country. The coercive control elements, it's not just about physical abuse. It involves emotional, psychological, verbal, and all the types of abuse that you alluded to. So as we're tiptoeing up and talking about the discretion of a district court, almost seems like what you're suggesting is that in cases of domestic abuse, ameliorative measures are not almost ever going to be acceptable if you've proven the grave risk. We're not seeking a categorical rule. It really depends on the nature of the grave risk. But a proceed with great caution kind of rule. Certainly the courts below, some of the circuits have advised to proceed with caution and that there should be great hesitation to try to solve this type of complicated problem in an expedited proceeding, and we agree with that. Thank you. Thank you, Counsel. Mr. Gu? Thank you, Mr. Chief Justice, and may it please the Court. The Second Circuit requires courts to consider the full range of ameliorative measures in every case involving a finding of grave risk under Article 13B. That mandatory rule has no basis in the text of the Convention, and indeed Respondent hasn't identified any country in the world that has held that the Convention imposes such a rule. The Convention instead leaves consideration of ameliorative measures to the discretion of the courts, and ICARA, which Congress enacted to implement the Convention, leaves that discretion undisturbed. The Second Circuit's rule wrongly supplanted that discretion in this case. Accordingly, this Court should do what it usually does when lower courts have misunderstood the scope of their discretion. It should vacate and remand for further proceedings. I welcome the Court's questions. Well, one of the problems here, as Ms. King pointed out, is the delay, and you're sending it back after how many years has this been going on? About three and a half years. Three and a half years under a Convention that is designed to get this resolved quickly for obvious reasons, and you want there to be more proceedings. What do you think is going to happen on remand that is going to put the district court in any different position than it's in now? Well, we think the Second Circuit's mandatory rule may well have distorted the district court's analysis of the sufficiency of the ameliorative measures in this case. Under the Second Circuit's rule, which is articulated at Petition Appendix 14A and 81A, the district court had to order return, quote, if at all possible, end quote. That if at all possible standard, in our view, places too heavy a thumb on the scales in favor of return. It essentially renders denial of return a highly disfavored remedy, despite the Convention's objective of protecting the child from grave harm. And so if this court were to reject the Second Circuit's rule and remove that thumb from the scales, the district court may well evaluate the sufficiency of the ameliorative measures differently on remand. Yeah, I'm not sure that touched on my main concern, which was the additional delay that further proceedings... Oh, well, the Convention doesn't pursue any of its objectives at all costs, not even the objective of prompt adjudication. The Convention also cares about protecting children from the grave risk of harm, and we think the court that's in the best position to evaluate whether this child should be sent back in the face of a grave risk of harm is the district court. That's because the inquiry is highly fact-intensive, and the district court is the court that has the closest and deepest understanding of the record. Counsel, if I can follow up. My concern is similar to the Chief Justice's, and I think Justice Kavanaugh touched on it. The district court initially held, I think, a nine-day bench trial and found a grave risk and refused return before the court was reversed by the Court of Appeals. So why isn't that entirely appropriate? If we agree with everything you've said about the law, why isn't that the appropriate conclusion in this case, and a reversal therefore warranted? Because the court did a nine-day. I mean, you say it should be thoughtful, and it was thoughtful. It was supposed to be quick. It was quick. And here we are three and a half years later. Well, I think the fact of the matter is that Respondent has gotten two bites of the apple at proving up amulet of measures. Now we have a third. Well, my point is that Petitioner, in contrast, has had zero chance to ask for a favorable exercise of discretion. Petitioner is happy with the first judgment of the district court. I'm pretty sure about that. Well, no, Petitioner lost the first time at the district court. At the Court of Appeals. But the petitioner, there was a grave risk finding it at the district court. There was a grave risk finding it, and the district court under the Second Circuit's mandatory rule felt bound to then consider. But if we say no, maybe I'm sorry if I'm not being clear, but if we say that the Second Circuit's rule is inappropriate, and the district court after a nine-day trial found grave risk, why doesn't that lead to a reversal and at least allow the parties in this case to move on with their lives? If the court thinks that the proper exercise of discretion in this case in the face of a finding of grave risk is to deny a return, then that is a perfectly acceptable result. I'm certainly not going to fight it. The only reason why we think a vacature and remand is appropriate is because we think after a finding of grave risk, there is room for discretion for the district court to analyze whether or not there is grave risk. Now, of course, here after the district court's initial ruling, which denied return in the face of ameliorative measures that were ultimately found to be insufficient, there has been this Italian court order that's entered the picture. We think it would be perfectly acceptable for the court now to consider, as it did in its most recent decision, the effect of that order on ameliorating risk. But the key point for us... If I understand it, that Italian order came about as a result of this self-directed inquiry that the district court did on remand on its own notion. Absolutely. And we agree that when the Second Circuit, in the initial appeal, found the original set of ameliorative measures insufficient... I have trouble with it, too. I have a lot of trouble with it. The Second Circuit should have done one of two things. It should have simply denied return, as I think Your Honor is suggesting. Which is what she did the first time. Well, no, the first time she ordered return because she thought the first set of ameliorative measures were sufficient. But if the Second Circuit was right that those measures were insufficient, what the Second Circuit should have done was one of two things. Either simply deny return or remand the case for the district court to exercise its discretion on whether to deny return. What it should not have done is mandate that the district court engage in another round, another full examination of whatever ameliorative measures exist, including measures that Respondent had never even proposed. That added nine more months to the proceedings that had already lasted ten months. And while it's true that we cannot undo the procedural implications of the Second Circuit's rule, that is, we can't go back in time and put us back to where we were a couple of years ago, what the court can do, in our view, is undo the substantive implications, which is to vacate the judgment below and at least send it back for the district court to take a fresh look at this in light of the right standards. Well, Mr. Liu, I guess two questions. I mean, suppose we were to send it back and say, no, the Second Circuit rule is wrong and you had discretion. Number one, and this relates to Justice Alito's question, could she then use her discretion? Notwithstanding that the court had found grave risk, could it nonetheless say, yes, we're going to send the child back because there are sufficient ameliorative measures? So the first question is, could she make that order without abusing discretion? And I guess the second question is, you know the record better than I do, and you've read the various opinions more closely than I have. What do you think that the prospects are that the district court would want to do that? I mean, once the Second Circuit rule is taken away, do you think that there's really any chance that the district court would have said, yes, under my discretion I think that these ameliorative measures are sufficient so as to send the child back? So as to your first question, Justice Kagan, we think it's possible for the district court on remand to conclude that return is appropriate in light of what the district court views to be the sufficiency of the measures, and that would not be an abuse of discretion if the court thought those measures were indeed sufficient under a proper understanding of the law. As to your second question, I think the record is frankly unclear what the district court would do. This is a district court that initially found, this is Petition Appendix 80A, that this particular respondent has to date exhibited no capacity to change his behavior, and the Second Circuit on appeal, that was the very reason the Second Circuit found the first set of measures insufficient, because the Second Circuit itself concluded that there was ample reason to doubt whether a respondent would comply with those conditions. I think once this court, if this court were to remove the thumb on the scales, it's possible the district court would feel frankly less pressure to conclude that return was appropriate in light of these measures, and may well think that although there are some indications going both ways on whether a respondent would or would not comply, it's simply not worth the gamble to send the child back. I think it's that sort of discretionary judgment that the convention and ICARA leave to the district court in a case like this, and because the district court is most familiar with the facts in the record, a remand would be appropriate. Can I ask you the questions that I asked Ms. King to start out with? Does the United States think that there are any circumstances in which it would be lawful for a district judge to send a child back to the country of habitual residence, despite a finding that the child would be at grave risk? We do. The circumstance is limited, I think, to cases where the risk of the child staying in the country where the hate convention proceedings are taking place is equally as grave or even graver. I suppose that's a very small set of situations, but I certainly cannot rule it out, and I think that's why from the explanatory report to the State Department's original analysis of this convention in 1986, we've always said, and everyone has always said, that there is discretion left in the judicial authority to send the child back even in the face of danger. Okay, that's a very, very narrow set of cases, a very small set of cases, as you just acknowledged. I agree. And would it be fair to say that in this country that would be even narrower than it might be in all of the signatory nations? I'm fairly confident that's true, yes. So you're pretty close to a categorical rule. If there's a grave risk, the child can't be sent back. However, ameliorative measures, they go to the issue of whether there would be a grave risk. Right. So the only question that's left is how deeply can the court in one of these proceedings get into the issue of ameliorative measures? If it's something simple like moving away from a toxic waste dump, that's one thing, but if it gets into the sorts of things that are generally done by family courts in issuing protective orders, custody determinations, visitation rights, that sort of thing, are they completely off the board? Are they possibly things that can be considered, provided it can be done expeditiously? What if they're already in place? Well, we think the district court's consideration of ameliorative measures should be entrusted to the court's sound judgment, as many issues are in the convention, and then reviewable for an abuse of discretion. Now, I think there's a big difference, though, between the general abuse of discretion standard and the Second Circuit's rule. And I think the line is crossed with the Second Circuit's rule, because it is not simply applying a generally applicable background abuse of discretion standard, the sort of appellate standard Congress certainly had in mind when it enacted ICARA and granted the court's jurisdiction. Rather, the Second Circuit's rule is a convention-specific rule that I think crosses the line into implementing the convention, which is not a role that, in this country, we entrust to courts. That is a role that belongs to Congress only. And so when Congress enacted ICARA against the background of general principles of appellate review, it empowered courts to police the discretion that lower courts are going to be exercising. Well, what I get from your answer so far is that the Second Circuit went too far in limiting the discretion of the district court. But is it inappropriate for a court of appeals that may see a number of these cases? I don't know how many there are. There are not that many, I don't believe. But if they see a series of them, they have to have some standards in determining whether there was an abuse of discretion here and not an abuse of discretion there. So the idea of their working out standards to structure the exercise of discretion is not inappropriate. It's not just, well, the district court can do whatever the district court wants so long as the court says this and that. Correct. And in Part B of the United States Brief in this case, we've tried to map out a basic framework for thinking about these cases, sort of a procedural reasonableness side of things having to do with when arguments need to be considered, and then a substantive reasonableness side of things, which has to go with exercises of judgment, like the hypothetical you gave about sending a child back in the face of a grave risk. We think those sorts of general principles are fine, and they reflect I think what Congress anticipated courts doing when Congress gave courts jurisdiction to consider cases under the convention and to decide cases in accordance with the convention. Where the Second Circuit's rule goes awry is that it sets up a rigid rule that I think can only be understood as an implementation of the treaty that it has no power to do. Just one question, Mr. Lewitt. It seems to me that we're in a very unfortunate position because we have a very unrepresentative record, and we're trying to develop a rule that applies in more representative cases. You know, this convention and the statute says district courts are supposed to act expeditiously. But what they mean, and a lot of times when we're told to move promptly, you know, that means two years instead of four, but here it says the judge is supposed to reach a decision within six weeks, and if he doesn't, he or she doesn't, you know, he's got to explain it to the central authority about why it's taking so long. And what consideration of ameliorative conditions after a determination of grave risk means in that context, it has to be, I mean, everybody in these cases wants desperately to make sure they get the right answer. But that means you've got to kind of move fast and loose to get it done in time. And that sounds bad with respect to the person, the child's grave risk possibility. On the other hand, as Justice Breyer pointed out, the other side, it's kidnapping. So how are we supposed to take all of those things, how are the district courts supposed to take all of those things into account within six weeks? It's not like a case like this where you contact the Italian authorities, they say we're going to do this, you go through all that. That's not how it's supposed to happen. Now, Justice Alito is asking about whether there should be a categorical rule, and that certainly would speed things up, and maybe that makes a lot of sense. Well, we think our abuse of discretion standard will speed things up, just like the rule this court announced in Minaski, because it will at least speed up the appeal by allowing courts of appeals to really not need to take as deep of a look as they otherwise would under de novo review. But to the question about how district courts can handle this, although we agree with Petitioner that the grave risk inquiry is analytically distinct from the emulative measures inquiry, we don't think those two inquiries need to happen in terms of timing one after another. A district court can sequence them so that they're happening at the same time, just as you would hear a trial about elements of an offense along with defenses at the same time. All those things can happen together, and district courts, in the cases we've seen, have proved quite capable of holding very prompt hearings where live witnesses are called in, the parents will testify, sometimes the child will be interviewed in camera. And so we've seen district courts be able to move expeditiously in cases like this. Justice Breyer, anything further? Justice Alito? Yes. I'm borrowing a page from questioning of one of my colleagues, usually. Tell me how to write this for the district court in this case. This district court was guided by the principle, erroneous according to you, that if at all possible the child must be returned. So how do we tell the district court judge it's not merely a possibility? What is it? What is the issue that you have to be addressing? I think the overarching issue is whether, in the face of a finding of grave risk, there are countervailing considerations that nevertheless render return appropriate. Now, granted, that is a broad standard, but I think it avoids what the Second Circuit's rule does, which is to put a thumb on the scales one way or the other on return or denying return. And I think what the opinion could say is, district court, please take another look at the sufficiency of these measures and other considerations that might weigh against return in light of the fact that there is no thumb on the scales. Mr. Luke, would you clarify something for me? Because I think I'm a little bit confused because different people are using this term, grave risk, in different ways. Sometimes to me in the preliminary determination before consideration of ameliorative measures, and sometimes maybe to me in the final conclusion, like even with ameliorative measures there's still a grave risk. So when you said, I think it was to Justice Alito maybe, when you said it would be extraordinary to send a child home if there was a finding of grave risk, I mean, on one view that means like, oh, you can find all the ameliorative measures in the world and it would still be extraordinary. On another view, you only meant grave risk after the ameliorative measures were considered. Correct. In that response, I meant only grave risk after considering ameliorative measures and their effect on the grave risk. Okay. And if we were to try to figure out some standards on this view that's like, wow, tell every district court judge in America you have all the discretion you want about how to consider ameliorative measures, write me a paragraph along the lines of Justice Sotomayor's question. What standards does the State Department, does the U.S. government think would be appropriate? I mean, what should guide the district court's discretion in the U.S. government's view? Well, we think there are, to draw a contrast to the Second Circuit's view, there are four categories of cases where a court could reasonably decline to consider ameliorative measures. One category is where the parties simply haven't raised any. Another category is where the measures clearly have no chance of working. Another category is where the measures would usurp the role of the child custody court in the country of habitual residence. And a fourth is where consideration of the measures would unduly prolong the proceedings. Those are instances where a court could reasonably conclude that it's just not worth the candle to go through and consider ameliorative measures. But there are going to be other cases that don't fall within those four buckets where it's going to be perfectly appropriate and, indeed, the best and most sound exercise of judgment to consider the measures that the parties have put before them. Maybe they've already obtained the order, the protective order, so there's no concern about a delay in the proceedings. Maybe that order, because it was already issued, doesn't raise any concerns at all about whether it usurped the role of the court overseas. And so there are certainly instances where we would encourage and have no problem with courts considering ameliorative measures, so long as they abide by the other objectives of the Convention and prompt adjudication, avoiding venturing into the merits of the underlying dispute. Justice Gorsuch? Do you agree with the statement that the petitioner makes at page 17 of the brief that says, quote, ameliorative measures will almost never be appropriate in the context of domestic violence, end quote? We think that's probably too strong. I think we would avoid any sort of categorical statement about domestic violence cases and whether the measures would be sufficient. The fact of the matter is even domestic violence cases vary in terms of their facts and circumstances, and I think it would be kind of making the same error to then put a thumb on the scale in the other direction in domestic violence cases. So I would just be cautious about any sort of categorical statement about domestic violence cases. Won't those cases, though, tend to have the kinds of conditions that you were talking about as saying, I think that ameliorative measures will be unlikely to work. It will take a while. It's difficult to ensure it's going to work, asserting the role of the custody. It seems like those are going to be present in most, and they said almost never, not never. I think those circumstances may well be present in a fair number of domestic violence cases, and I think it's true that domestic violence cases raise those concerns more than other types of cases. I would just be wary about setting up any sort of general presumption. Well, what about, just to add to that, this is supposed to be a temporary determination as well. This is not the final determination. This is just kind of a holding pattern until we get the custody determination to pick up on the chief justice points. And when you combine that with what I think you've acknowledged about the domestic violence cases, it seems difficult to think that ameliorative measures will be able to be assessed, determined in that kind of quick period. And why would you want to when it's just a temporary hold? I think those are all fair points. Yes, I think a district judge who adopted that sort of reasoning would be on pretty solid ground. The reason why I'm holding back is because these cases are so different factually that I don't want to say anything that would suggest there's a rigid rule going the other way in these sorts of cases. I appreciate it. Thank you. Justice Barrett? So I think my sticking point is the same one that others have asked you. It's difficult to figure out how to write this paragraph. And your answer to Justice Kagan, I mean, I understand why the United States doesn't want to box itself in to a particular thing, but it frankly wouldn't give district courts that much guidance. And you were talking about not putting a thumb on the scale because at risk of falling into the error that the Second Circuit may have fallen into. But it did more than have a thumb on the scale. I mean, it had a categorical rule. And I don't see anything in the United States' position that would prevent, Justice Alito talked about each court of appeals developing standards to guide the exercise of discretion. I don't see anything in what the United States has proposed that would prevent a thumb on the scale one way or another. In my discretion, I am generally going to use extreme caution, as I suggested to Ms. King, before imposing ameliorative measures in a domestic violence case. It seems to me like those are the kinds of things that shape discretion. And as Justice Kavanaugh said, it seems like in these complex domestic violence-type cases, all of the risks that you're talking about would be present. So would it really be so bad if we try to, if we send it back, offer something in the way of guidance? Even if it is simply to say, yes, district courts have discretion that should be exercised consistent with ICRA and the Hague Convention. However, given these concerns and how they're often present in domestic violence cases, use caution before going forward with them in that context. I think so long as there is a substantial caveat that there may be other cases, even in the domestic violence context where ameliorative measures are appropriate, that that would be fine. You know, the United States is in a position where we have children, of course, abducted from foreign countries who are here, but we are also in a situation where we have children from the United States abducted to other countries. And there may be allegations of domestic violence in those cases, and we want the judges abroad to also take into account the specific circumstances of each case and be sensitive to how those differences may or may not make ameliorative measures in that case an appropriate remedy. So I would simply, you know, make sure that I got across that the United States is on both sides of the issue of whether the child is incoming or outgoing. That's very helpful. Thank you, Mr. Liu. Thank you, Counsel. Mr. Meehan. Mr. Chief Justice, and may it please the Court, the Convention's text, context, and purpose require that reasonable ameliorative measures be considered when adjudicating these complex family abduction cases. To refuse to consider measures that might allow for the safe return of children back to their home country would be an abuse of discretion and would violate the purpose of the Convention, which is built on a system of mutual trust between signatory nations. This approach, supported by the Hague Conference, ensures consistent results here in the United States and expectations for U.S. children abducted abroad by providing courts clear guidance on how to evaluate this exception. The lower court here took into consideration the unique facts of this case and of this family. Specifically, the limited provisional order in this case addressed the grave risk of harm to this child, which was caused by potential exposure to domestic violence between the parties. The return order helps to deter future abductions, which Congress has found to be harmful to children, while also protecting the interests of this child, ensuring that the custody dispute takes place in Italy, his home country. The core premise of the Convention is that the interests of children in matters relating to their custody are best served when custody decisions are made in the country of habitual residence. Ultimately, the treaty is not about who should have custody, but rather where those decisions should be made. The Italian courts have already issued orders protecting this child, and they have scheduled a hearing in June to address issues of custody. As this court found in Abbott, there is no reason to doubt the ability of other contracting states to carry out their duty to make decisions in the best interest of children. Further, as this court found in Minaski, domestic violence should be an issue fully explored in the custody adjudication upon the child's return. The court should therefore affirm the order directing the immediate return of BAS back to Italy. I'm happy to entertain any questions. This ameliorative conditions doctrine, rule, it has no basis in the Convention or the statute, right? And by which I mean it's not a concept that the statute or the Convention refers to. Grave risk is all that we're talking about, right? Yes, but we believe it's inherent and implicit in the text of the Convention, meaning that the Article 13b grave risk inquiry necessitates an analysis of the future risk of harm to the child, including any potential mitigating factors. This is an approach that the United States themselves supported in the Blondin Second Appeal. On page 21 of their amicus brief, they said, and they supported the Blondin II language, saying it supported that past abuse should not constitute a finding of grave risk of harm without the additional finding that there is a likelihood of and no adequate option to prevent future abuse upon return, which means that to find a grave risk of harm, you must find there's no way to protect the child upon return. Well, but by creating ameliorative conditions as sort of a separate concept, it's almost like you're adding a subsection to 13. It does have the potential and maybe the, I don't want to say inevitable, but the likelihood of extending the proceedings. It's one thing if you just factor it into determining whether there's a grave risk. It's another thing if you say, okay, you've got grave risk, now what kind of conditions can we impose? Because once you do that, you're talking about ameliorative conditions that are added as the process goes on. You know, oh, you think it's risky that there's this? Okay, here's what we're going to do. Or this, this is what we're going to do, as opposed to things that are, I mean, that could be factored into the grave risk concerns as part of the same process. It's a bad thing that, you know, the child is in this situation and this is going to affect them or where the education is going to be or whatever. And in the process of debating that, simply say, well, this is what we're going to do, this can happen, but not sort of extend it as a whole separate inquiry. Well, we agree that it should be a one-step process and the analysis should be done in the same stage. However, we also believe that pursuant to the language of Article 13 and 18 of the convention, that the court has discretion to return a child even with a grave risk finding in place. That discretion, as Justice Alito mentioned earlier, would reasonably only occur if there were sufficient ameliorative measures in place to return a child. We agree that absent measures to protect a child, it would be highly unusual to direct a return of the child after a grave risk finding. However, there are certain circumstances where that might be appropriate, such as if the abducting parent is creating the situation of grave risk in the home country, such as refusing to obtain an order of protection or refusing to seek some sort of relief that might protect the child. The court may, in that circumstance, decide that balancing the factors, one, to deter future abductions. They will not sanction behavior of abducting parents who do not cooperate in efforts to protect a child upon a return and therefore return the child notwithstanding a grave risk finding. But the United States position, again, in the Blondin II amicus brief, the Blondin amicus brief, talked about the fact that the system is built on mutual trust and cooperation. Ultimately, the purpose of the convention is to believe that the foreign courts can protect children. It will lead to consistent results here and abroad. I'm afraid of writing anything. You see the problem? It seems to me that why isn't the right group to write something? There are bureaus and there are people who have this as their profession. We're not a family court. And any word we write is capable of being used in a context, in a case, where it does not belong. Okay? So when you say, let's put our thumb, that's what Justice Barrett said. Yeah, okay. That seems like the best possible approach. And even there, I'm not certain of what thumb and what those words should be. A family court judge has the hardest judge, in my opinion, in this system. And so what do we say? I take it you agree that what the Second Circuit said must be wrong. I mean, there will be cases where there is nothing to be said about undertakings. And you shouldn't go into a judge. You're going to be here for five years. And the child shouldn't be sent back to Afghanistan because they're bombing every five minutes. And I can make up some other country if I need to. So it can't be an absolute rule, in my opinion. But go ahead, answer that. Tell me why it has to be. Why we should write something and what those words should be, in your opinion. To clarify, there is a distinction between consideration and implementation of militant measures. Consideration, as the case law suggests in the Second Circuit, can be instantaneous. A court can say, well, a child was abducted from Afghanistan. I've considered if there's anything we can do to protect the child. I don't believe there is anything because the entire country is being bombed, using Your Honor's example. That is consideration. That is what the Second Circuit rule has implemented. The Second Circuit case law is very clear that they have not remanded cases, historically, for failure to consider all available militant measures. The full panoply, as the United States and as Petitioner believes the rule states. The application of the rule is that the court examines the record put before them, considers some very readily accessible and easily available militant measures, which the United States has supported, and in that limited purpose, considers normal protective measures, such as orders of protection, whether or not supervised visitation can be put in place. For example, the medical cases, as part of grave risk, is very illuminating to use as an analogy. In the Armenian case, and I believe the Aydin case in the Second Circuit, the abducted parent was required to show that there was no medical treatment available in the home country before the court could find that there was grave risk of harm. This is precisely our argument, that connected to the grave risk inquiry, one must show that the child cannot be protected or cannot be treated in the home country. It's not sufficient to show, while the child can get medical treatment in the United States, we don't have to worry about what's available in the other country. They must engage in some sort of analysis of what is possible and appropriate in the home country. I just want to see if you agree with Mr. Liu. He gave us at least four things that he thought we could get our hands around when it comes to militant measures. I understand your point that we have to determine whether there's grave risk in the home country and medical conditions. But he said that you don't have to consider measures that are not raised by the parties, one. Two, you don't have to pursue things that are obviously not workable. Three, you don't have to consider measures that would assert local authority. And four, he said you don't have to consider measures if it would prolong proceedings significantly. Do you disagree with any of those? Yes. Starting from the first one, the United States, in their own brief, suggested that the courts can sui sponte, consider available... Of course it can. But it doesn't have to, as I believe, as I understood, Mr. Liu. It's not required to. It wouldn't be an abuse of discretion if it failed to consider sui sponte measures on its own. And that may be the fundamental problem with the Second Circuit's approach, right, is that it seemed to suggest that the district court had to go out and investigate measures on its own, as Justice Sotomayor suggested. So, again, those four things. Any problem with any of them? That one doesn't count. Well, we believe that the Hague Conference, in their Guide to Good Practice, has stated that the courts must consider available and readily accessible ameliorative measures. And we agree that would be the appropriate measure. So available would be presented by the parties, and readily accessible would, I think, track what Mr. Liu said, and it could throw out things that were obviously not workable. That wouldn't be an abuse of discretion. So I haven't heard anything from you, and I haven't read anything in your brief, if I recall, that disagrees with at least these four things. Well, I think if the parties did not present an option such as moving away from the nuclear plan, and if the court considered that as a very easily accessible and readily available ameliorative measure, the court would have a duty to consider something that is very knowable in those circumstances. On its own? Yes, on its own. Okay, let's say we disagree with that. You know, we don't normally have, as Justice Sotomayor says, an inquisitorial justice system. It's an adversarial one in this country. Then what? Well, the United States has supported judges reaching out to the international network of Hague judges, and we should remember that Congress has promoted or says that there should be uniform interpretation internationally of this convention, which means that it should work not only for the United States courts but also international courts, and that courts all around the world should apply the provisions of the convention fairly uniformly. So the United States has supported courts and district judges reaching out to the international network of Hague judges. We agree that that should be something that courts consider in cases of grave risk of harm. We also believe that the presumption should be in all cases that the home country can protect children. That is the system that this convention is built on, and inherent in that system would be an acknowledgment that most countries have orders of protection, custody courts that can supervise children, that these are things that courts should sui sponte consider before rejecting the efficacy of these measures. Now, again, the simple fact that they consider this, even if it is just a fleeting thought, is sufficient, and the Second Circuit case law does not require that they do anything further than that. On the second point, we agree obvious, readily accessible, available remedies is what the court should be mandated to consider. The Second Circuit language in case law, as inartfully as it might be drafted, again, in practice, is not applied the way that Petitioner and the United States paints it. It is more restrictive, meaning that they do defer to the district court's analysis of the record and proposals. The Davies case, which occurred the year before this case in the Second Circuit, the district court denied the return to French St. Martin after ameliorative measures and undertakings were proposed. On remand, the Second Circuit did not, on appeal, the Second Circuit did not remand for failure to consider the full panoply of ameliorative measures, for failure to consider all theoretical ameliorative measures. They simply affirmed, stating the district court considered the record put forth before them, considered available ameliorative measures, and agreed that the child should not be returned. Counsel, I'm sorry. I'm about 90 seconds behind you. But you said that the consideration can be fleeting, doesn't have to be terribly involved. How would you describe the consideration in this case? Certainly far beyond fleeting, right? Quite elaborate, ongoing, getting the international courts involved. So would you at least acknowledge that the depth of consideration went far beyond what would be true in the normal case? Well, in this case, the parties again proposed substantial ameliorative measures during the evidentiary portion of this case. It was only after the Second Circuit remand that the court engaged in further analysis and trying to convert the mostly undertakings in ameliorative measures into more enforceable orders. Of course, to some extent, the analysis or evaluation of ameliorative measures is a process that would take time, of course. But the United States themselves, again, in the Blonde and Amicus brief, criticized the grave risk process which required expert testimony and said that it would result to delays and prolonging cases. And in my experience, it is grave risk analysis itself that often leads to long delays in the adjudication of these cases. Very rarely do grave risk cases get resolved within six weeks. They require expert testimony. They require the analysis of the foreign country's mechanism and legal system. In this case, Petitioner put their case on first because they were trying to substantiate the exception. And in their case, they called an Italian legal expert who criticized Italy and also criticized the U.S. system for protecting domestic violence, and they also called two experts on grave risk of harm. So simultaneous with that evidence being adduced, the question of ameliorative measures was also presented. So there is no real time delay that would be created by considering ameliorative measures, and certainly one must consider the overarching purpose of the grantion, which is to return children back to their home country. Ultimately, the question that I've heard from several justices is about the rule that should be provided to courts in these types of cases. And we believe that, very simply, the court must consider all evidence of ameliorative measures that are presented to them by either party during the course of proceedings, that it is Petitioner or the abducting parent's ability to do so, to overcome the presumption that courts in the system in the home country are capable of protecting children, and that that presumption may be overcome by evidence stating that they have either attempted to secure protection and were denied that protection, which can lead a district court to conclude that that country cannot protect that child, or by producing some sort of evidence through experts or other means about the deficiencies in that legal system. Not in my experience, but I have followed some of these cases with care. If a court decides, I'm not altogether sure about whether the abuse occurred, or if the abuse occurred in the manner that the Petitioner says, not the Petitioner, that the respondent says, I think that that issue is one that should be looked at more closely by the court making the custody decision. I need to rule expeditiously in this case. So, given my deep uncertainty, I'm not sure I'm going to make a grave risk finding, or I'm going to find there may be a risk, but I'm not sure of its extent. I think these measures are enough to return the child. What mechanism is there for a court to do that? So, hate cases are often described as summary proceedings. There are several rules that allow for expeditious proceedings, such as the requirement that documents not have to be authenticated to be produced as evidence. We believe that a mandatory consideration will speed up resolution of these cases. First, it gives clear guidance to district court judges how to evaluate. No, I understand all of that, counsel. The assumption here has been that there's been a grave risk finding, but as I indicated, especially in domestic abuse cases, they're messy. And who's abusing whom and to what extent and under what circumstances is always an issue, okay? What legal mechanism is there for a court who's unsure? I don't want to make a grave risk finding because I think that that really belongs to the custody court. I'm on the margin. Could, without that finding, a court say, I'm going to return you? Yes. We believe that through summary judgment motions and processes, that if there is mandatory consideration of a myriad of measures, that the left-behind parent can put forth evidence that taking the abducting parent's allegations at their extreme, which is what the United Kingdom does in their analysis, taking their allegations at face value, there are sufficient measures that would still protect the child, then they do not have to go through the thorough analysis and evidence-gathering to figure out whether the allegations are then themselves true. And this is something that the Hague Conference has talked about in their guide to good practice. And so that would, in effect, speed up these cases considerably. I mean, what about saying that? I'm looking for the thumb. Not say quite in those words. After all, the U.K. is talking about a special treaty that includes EU countries where they know the courts have these particular things, maybe. But just say. The question is difficult. It has to do with whether there really will be a grave risk or whether there won't be a grave risk. And we'd recommend, or it's quite possible the district court is free to, consult the guidance of experts on the subject. For example, the March 9, 2020, statement issued by the Child Abduction Convention Guide, by the Permanent Bureau of the Hague Conference, whatever it is, we cite that. But we don't tell them they have to do it. We just say, in an appropriate case, the judge is free, of course, to consider the views of those who work in this field, such as. Now, we don't have to say too much, and they'll do it. I mean, so what about something like that? And not in every case, but in an appropriate case. Again, we believe, and we agree with the United States, that discretion should be guided by sound legal principles and the large objectives of the convention. We believe that it would be an abuse of discretion for a court to fail to consider very reasonable and accessible and available ameliorative measures in cases where they may help the return of the child back to the home country. Again, if it's an extreme case where an abductor has violated and shown a propensity to violate court orders in the past, where the abducting parent has sought orders of protection and sought the refuge of police in the home country and they have not offered their assistance back home, in those types of cases, the court can easily consider and say, I've thought about how we can protect this child. None of them, I think, will work, and they can move on to their final decision. We do not believe that the mandatory consideration adds any more time, because if they believe that it could assist in returning the child and implemented that,  and it would take the same time if they denied the implementation of the ameliorative measures. Again, the consideration versus implementation is an important distinction. A lot of the concerns here are about implementing ameliorative measures, but even if we concede or even if we accept that ameliorative measures are discretionary, the implementation of them will, of course, take some time. Now, in this case, when Ms. Golan actually sought the order of protection in December 2019, she obtained it one week later. So there really was no delay in obtaining the necessary ameliorative measures to protect this child in this case, and oftentimes there will not have to be. If this court does not have any further questions, we certainly would urge this court to affirm the return of VAS. As I stated in my opening statement, the Italian courts are ready to adjudicate the best interest of this child. They have a hearing scheduled in June. They have appointed an attorney for the child to represent the child's interest. They have issued orders that substantially protect the interest of this child and reduce any risk to this child below the threshold of grave risk of harm. Anything further? Thank you, counsel. Thank you. Rebuttal, Ms. King? Yes, thank you. To start with the Italian proceeding, all that's happened in Italy is more placeholder dates, the same that's happened in the last three years since that case was filed. The only substantive action taken in the Italian proceeding was the one that was put in place at the request of this U.S. District Court going through the parties and forcing the parties to apply for a particular order. I want to go back to the notion of an exception. This is the fifth Hague case that this court has heard in 12 years, and in each of its prior opinions it identified the grave risk exception as an example of where return is not required because it is the plain reading of the Convention. There is no obligation to return, no heavy thumb on the scale towards return once grave risk is proven. The exception exists for a reason, and this is the first case where a mother has proven the grave risk exception by the exceedingly high evidentiary standard in this country, by clear and convincing evidence. If we go back the three years to March 22nd of 2019, when the District Court made that grave risk finding, I just want to note that that finding was never even appealed. It stands to this day, all of those findings of horrific violence, of the character failings of Mr. Sada, and of the harm, psychological and physical harm, to the young child in this case. But everything that followed from that is infected by the Second Circuit's mandatory requirement to exhaustively consider and try to find a way to send the child back. And Mr. Min says that ameliorative measures was part of the trial, and that's not exactly true. Although they were mentioned in the trial, there was not a detailed factual finding about ameliorative measures. It came up after, or in the middle of, closing arguments. At the end of closing arguments is when the District Court said, oh, by the way, can you please propose some ameliorative measures? And at that time, the ameliorative measures proposed by Mr. Sada were a bunch of promises, essentially. And even the Second Circuit agrees that those promises are not reliable, are not consistent with the Convention's requirement to try and protect the children. And at the end of the day, the Second Circuit's rule then required another bite at the apple, so to speak, and forced the District Court then to engage in this nine-and-a-half-month process that I think we can all recognize as being improper under the Convention's requirements. The procedural and substantive defects with that ultimate process are too ingrained for us to send this back. If the defect is it took too long, the remedy shouldn't be, well, give them more time to try again. If the defect is the District Court should not have entangled itself with custody matters, the remedy should not be to accept that protective order now and allow the parties to engage with it. Because there's a safe and swift resolution, we urge a reversal. Thank you, counsel. The case is submitted.